THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. ISMAEL LOPEZ, Defendant-Appellee.

Second District   No. 2—00—0747

Opinion filed March 21, 2002.

Joseph E. Birkett, State's Attorney, of Wheaton (Margaret M. Healy, Assistant State's Attorney, and Martin P. Moltz and Cynthia N. Schneider, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

G. Joseph Weller and Dev A. Parikh, both of State Appellate Defender's Office, of Elgin, for appellee.

JUSTICE O'MALLEY delivered the opinion of the court:

Defendant, Ismael Lopez, was charged under section 12—16(c)(1)(i) of the Criminal Code of 1961 (Criminal Code) (720 ILCS 5/12—16(c)(1)(i) (West 1998)) with aggravated criminal sexual abuse. Specifically, the indictment alleged that defendant "knowingly fondled the vaginal area of [B.B.] for the purpose of the sexual arousal of the defendant." On defendant's motion, the trial court ordered the State to produce B.B. for a physical examination by a physician retained by the defense. The victim's family refused to produce her for the examination. Defendant then moved for an order barring the State from introducing any evidence or testimony from B.B.'s examining physicians concerning their physical examinations of her. Denying the State's request for a hearing, the trial court granted the motion. We vacate the order granting defendant's motion for an independent physical examination of B.B. and remand the cause.

## BACKGROUND

Suspecting that B.B. was being sexually abused, her grandmother made an appointment with B.B.'s physician, Dr. E. Anderson. B.B. was 20 months old at that time. In a report dated December 1, 1998, Dr. Anderson noted "an adhesion of the labia with a synechial scar of the

tissue touching together, covering the opening of the [vagina] and obscuring the hymen." The labia was "moderately red." Dr. Anderson further stated, "A careful exam of the labial origin post to this shows a small false passage, suggestive of partial tearing." Dr. Anderson was not able to inspect B.B.'s hymen adequately. When he attempted to separate B.B.'s labia or view her vagina, B.B. reported discomfort and then "with[drew] from the situation." Dr. Anderson's conclusion was "suspected sexual abuse based on the apparent scar tissue surrounding the vagina." He explained:

> "I cannot 100% [rule out] that this is a developmental anomaly, but due to the tear post, I feel this probably is traumatic. Certainly, visualization of the hymen would provide additional useful info[rmation] for a definitive [diagnosis], although the synechia is suggestive of previous scarring and raw edges coming together, suggestive of trauma. *** Due to the swelling of the tissues, I should note that it was difficult to decide whether the tissue adhesion was with the labia minora or with the actual [vaginal] wall, although it would appear to be most likely labial."

Dr. Meghan Flannery examined B.B. soon after Dr. Anderson's examination. She examined B.B. in the "frog leg" and "knee/chest" positions and prepared 17 colposcopic photographs of B.B.'s vaginal region. In her notes of December 3, 1998, Dr. Flannery reported:

> "Thin hymenal rim with partial obliteration of the rim posteriorly. Edges of the hymen are thickened. Notched areas at approximately the two o'clock and ten o'clock positions. Widened elongated hymen. Exam suspicious for trauma most likely consistent with digital penetration."

In February 1999, the State gave the defense the reports of Drs. Flannery and Anderson but not the photographs Dr. Flannery had taken during her examination. Although Dr. Flannery's report indicated that she had taken photographs during the examination, the defense did not request the photographs until September 1999. The defense received the photographs from the State in October 1999.

In January 2000, when B.B. was about three years old, the defense moved the court to order the State to produce B.B. for an independent gynecological examination by the defense's expert, Dr. Ramona Slupik. In its motion, the defense asserted that Dr. Slupik was "unable to concur in the findings of Dr. Flannery" and that Dr. Slupik believed "that after conducting her own examination of [B.B.], she would be able to come to a conclusion whether there is medical evidence consistent with digital penetration, as found by Dr. Flannery." The defense submitted an affidavit of Dr. Slupik, in which she stated in relevant part:

"I have reviewed medical records as well as colposcopic (magnified) photographs taken by Dr. Flannery at the time she examined the alleged victim on December 17, 1998. In addition to other findings, Dr. Flannery found a partial obliteration of the rim posteriorly. Based upon my review of the medical records I am unable to arrive at a conclusion with regard to this finding for the following reasons:

1) Partial obliteration of the hymen is not conclusively seen on the photographs submitted to me. Some clarification of the area of the hymen at 6 or 7 o'clock could be obtained by various other exam techniques, including a change of position.

A repeat examination of the alleged victim would resolve whether there is partial obliteration posteriorly. The examination would be conducted with the patient in supine (lying on her back) position, with the knees apart (so-called 'frog-leg' position) as well as in the prone position ('knee chest'). One ounce of sterile water would be used to rinse the hymen of any mucus or other debris and to facilitate its depiction. The exam would take approximately 5 minutes. Other than Q-tips, no other instruments would be used during the exam.

Further, 'findings' which were allegedly present during Dr. Flannery's exam 14 months ago should still be present now, if they are specific for sexual abuse. A female hymen does not re-grow, re-generate, or re-attach if truly traumatized by blunt force penetrating trauma. Findings that are specific for sexual abuse will be permanent."

At the hearing on the motion to produce B.B. for examination by Dr. Slupik, the State indicated that it had spoken with "our physician who did the examination" (presumably Dr. Flannery) and that "[s]he has proceeded by proffer." The State stated it did not believe defense counsel would have an objection to this manner of proceeding. When, at a later point in the hearing, the trial court asked the State whether it intended to file an affidavit to counter Dr. Slupik's, the prosecutor replied, "I don't believe we need [sic] at this point because I believe it is by stipulation, I am giving this by way of proffer."

The State then set forth Dr. Flannery's points of contention with Dr. Slupik's claims. Specifically, the physician denied that the examination Dr. Slupik proposed would take five minutes and that the evidence of trauma seen by Dr. Flannery would still be present when Dr. Slupik examined B.B. The State also contended that the defense's motion and Dr. Slupik's affidavit both "overstated" Dr. Flannery's description of the trauma. The State explained that Dr. Flannery did not, as the defense motion represented, conclude that there was medical evidence "consistent with digital penetration," but only that B.B.'s genitalia was "suspicious for trauma most likely consistent with digital

penetration." There is a "significant difference" between these two findings, the State suggested. The defense responded that the primary reason for the motion was that Dr. Slupik did not believe that the photographs "conclusive[ly]" showed partial obliteration of the hymen. The defense added that the State's "expert is agreeing that you cannot see in the photographs everything that she specifically saw in the examination." In response to the State's reference to the defense's delay in requesting the additional physical examination, the defense attorney advised the court that her heavy caseload was partially responsible for the delay.

The trial court granted the defense's motion for an examination of B.B. by Dr. Slupik. However, neither at the hearing nor in its written order did the court set forth any reason for its ruling. The only adumbration of a rationale was contained in the court's observation during argument that Dr. Flannery would not be permitted to testify at trial regarding her conclusions because "[she] can't even testify as to a speculation."

The State filed a motion to reconsider. Without hearing argument from the parties, the court denied the motion for "reasons stated of record." When B.B.'s family refused to produce her for the examination, the defense filed a motion to dismiss the indictment for the State's failure to produce B.B. The defense argued in its motion that Dr. Slupik's examination "could clearly exonerate" defendant and that defendant's "due process right to a fundamentally fair trial will be destroyed without the opportunity to obtain the potentially exonerating evidence that could come along only from an independent examination of the complaining witness."

At a hearing to schedule a deadline for the State's response, the State requested an evidentiary hearing for the parties to present the testimony of their experts. The State asserted that the court needed "to hear everything involved in this examination" in order to determine the appropriate sanction. Asserting that it considered the issue of the appropriate sanction "a simple legal issue," the court scheduled a future hearing for legal argument only.

At the parties' oral argument on the issue on May 3, 2000, the trial court noted that *People v. Wheeler*, 151 Ill. 2d 298 (1992), "give[s] us some significant guidance in terms of evaluating what's appropriate consistent with the defendant's right as well as with the victim's rights and the victim's family's rights." The court then continued the matter to May 9, promising to impose the sanction of dismissal or exclusion of evidence if the State did not produce B.B. for examination before the next hearing.

As of the May 9 hearing, the family still had refused to produce

B.B. for the examination. The State asked the court to conduct an evidentiary hearing before deciding the appropriate sanction. The court denied the request and dismissed the indictment. In its written order, the court indicated that its decision was "based upon the U.S. Constitution, Illinois Constitution, effective assistance of counsel, due process and reasons more fully set out in the record on this date and on 5-3-00."

The parties agreed that it would be wiser from a procedural standpoint to reinstate the indictment and have the court address the defense's motion as a motion *in limine* to exclude evidence. The court reinstated the indictment, and the defense filed a motion *in limine* to bar the State from presenting (1) the testimony of Drs. Anderson and Flannery concerning their examinations of B.B., as well as the testimony of any other medical personnel present during the examinations; and (2) any demonstrable evidence derived from the examinations as well as any testimony of nonexamining experts concerning such evidence.

At the hearing on the motion, the State made its third request for an evidentiary hearing. Opposing the request, the defense observed that the court, in ordering the examination, had already "balanced the discovery due process interests of the defendant against the privacy interests of the victim." The defense argued that a compelling interest existed for the examination because (1) Dr. Slupik determined that she could not verify the conclusions of Drs. Anderson and Flannery without examining B.B.; (2) B.B. had already been examined twice; and (3) the proposed examination was "nonphysically invasive." The defense argued that fairness would not be served either by allowing it to cross-examine Drs. Anderson and Flannery or by permitting the parties to present only nonexamining experts to testify concerning the colposcopic photographs. The latter remedy particularly was not adequate, the defense contended, because any testimony by a nonexamining expert concerning the photographs would have the physical examinations as its "direct source."

The State argued in response that the court's previous balancing of the respective interests was not adequate because the court "did not take into account all of the evidence that [the State] intend[ed] or attempted to present." The State pointed out that, based on her examination of the photographs, Dr. Slupik's only disagreement with Drs. Anderson and Flannery was with respect to their finding that B.B.'s genital area showed a partial posterior obliteration of her hymen. The State suggested that an evidentiary hearing should be conducted to determine whether a finding of a partial posterior obliteration of B.B.'s hymen is necessary to a conclusion that her genital

area had been traumatized. The State also asserted that the real concern was not, as the defense suggested, the physical nature of the examination but, rather, its potential psychological impact given its nature and the fact that it would be the third such examination that B.B. would undergo.

The court denied the State's request for an evidentiary hearing and granted the defense's motion *in limine*. The court's written order provided in relevant part:

"4. That the body of the young child is effectively still the physical evidence in this case (see the last statement in the affidavit of the defense report). The proposed defense examination of the 'evidence' would be more than potentially useful. In light of the incomplete or incondusive [*sic*] findings of the State's two experts and as it could determine whether or not 'findings' specific for sexual abuse are present, that exam could determine whether the alleged victim is a victim indeed (leaving as the only practical issue the identity of the perpetrator of the abuse). There is a clear need for the exam. (See *People v. Newberry*, [166 Ill. 2d 310 (1995)].)

5. That the State's position is that the defense, to ensure a fair trial, can simply review the State's medical records and findings and cross-examine the State's two experts. The Supreme Court in *People vs. Newberry*, and common sense, recognizes that 'while these opportunities exist, the relief they offer is illusory.' [*Newberry*, 166 Ill. 2d at 317.] The Supreme Court also recognized in *People vs. Wheeler*[, 151 Ill. 2d at 309], 'while it may be possible for an expert to form an opinion...based only on a review of reports-...[t]his is clearly not the preferred method.... An expert who has personally examined a victim in [*sic*] a better position to render an opinion than is an expert who has not done so.'

6. The Court in *People vs. Newberry* was concerned with the examination of physical evidence unlike *People vs. Wheeler* which dealt with a psycho therapist's [*sic*] interview with a rape victim. The *People vs. Wheeler* court barred the State's use of evidence of rape trauma syndrome through the testimony of an examining expert. The State would be allowed to introduce rape trauma evidence through a nonexamining expert. That is, arguably, the State could call an expert to describe the syndrome and its symptoms, and call other witnesses to offer evidence of those symptoms. The *People vs. Newberry* court upheld the dismissal of the charge because of the inability of the State to provide the physical evidence for the defense expert's examination. This is the situation in the case before this court. The State has shown that they are able, and willing, to present the young child, the physical evidence, to State's experts but not to a defense expert.

7. That issues of the defendant's due process right to a fundamentally fair trial, of the effective assistance of counsel, and of the right of confrontation (See *People vs. McClanahan*[, 191 Ill. 2d 127 (2000)]) under the Federal and State Constitutions are involved in this case. So is the issue of victims [*sic*] rights. So also is the issue of fundamental fairness."

The court excluded "the testimony of Dr. Anderson; the testimony and reports of Dr. Flannery; the testimony of any personnel present at the exams; and any photographs, diagrams or other demonstrative evidence procured during or as a result of the exams." In its comments at the hearing following the parties' arguments, the court suggested that section 115—6 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115—6 (West 1998)) contains a sanction "broader than the *Wheeler* sanction" and is precedent for excluding the State's evidence as requested by the defense. The court also remarked that it had previously granted the defense's request for examination because the request was "reasonable" and the examination would be "relevant" and "enlightening to the court."

## DECISION

■ In *People v. Glover*, 49 Ill. 2d 78, 82 (1971), our supreme court held that a trial court has "jurisdiction to order an examination of the complaining witness in a case involving a sex violation [citation] and it may, in the exercise of its discretion, do so when the defendant presents a compelling reason therefor." The defendant in *Glover* sought both a psychiatric examination of the complaining witness to investigate her alleged history of " 'emotional instability and immaturity' " and an ophthalmological examination "to determine her ability to see and identify the defendant." *Glover*, 49 Ill. 2d at 81. The defendant argued that the latter examination was necessary because it was dark at the time of the alleged assault and there were no other witnesses to the assault. The supreme court upheld the trial court's denial of the motion for the physical examination, providing no analysis but only the summary holding that "the record reflects no compelling reason" for the examination. *Glover*, 49 Ill. 2d at 82.

Several years later, we cited *Glover* in setting forth the rule that a trial court may order a physical examination of the complainant in a sex offense case provided the defendant demonstrates a compelling need for the examination. See *People v. Visgar*, 120 Ill. App. 3d 584, 587 (1983), citing *Glover*, 49 Ill. 2d 78. In *Visgar*, the defendant was charged with the lewd fondling of a child. The defendant moved for a physical examination of the complaining witness to determine "whether [her] hymen was intact." *Visgar*, 120 Ill. App. 3d at 587. We upheld the trial court's denial of the motion, reasoning that because

there was no allegation that the complaining witness was injured or that her vagina was penetrated, an examination of the vagina "would not be necessary for any purpose." *Visgar*, 120 Ill. App. 3d at 587.

We note that *Visgar* does not dispose of the defendant's request in this case. Defendant is charged under section 12—16(c)(1)(i) of the Criminal Code with committing "an act of sexual conduct with a victim who was under 13 years of age when the act was committed." 720 ILCS 5/12—16(c)(1)(i) West 1998). Section 12—12(e) of the Criminal Code (720 ILCS 5/12—12(e) (West 1998)) defines "sexual conduct," in relevant part, as "any intentional or knowing touching or fondling by the victim or the accused, either directly or through clothing, of the sex organs, anus or breast of the victim or the accused *** for the purpose of sexual gratification." The specific allegation in the indictment is that Lopez "knowingly fondled the vaginal area of [B.B.]" for his sexual gratification. Although it has not formally alleged that defendant penetrated B.B.'s vagina, the State has expressed an intention to introduce evidence of penetration, *i.e.*, that B.B.'s hymen is not intact, to prove its charge that defendant fondled B.B. On its face, the examination defendant proposes would be useful in challenging this evidence. Thus, we find *Visgar* distinguishable insofar as in this case, unlike *Visgar*, the State has alleged penetration and defendant has proposed an examination to confirm or disconfirm some of the State's proposed evidence of penetration.

■ We hold, nevertheless, that defendant has not demonstrated a compelling need for the examination he requests. The record is undeveloped on some points critical to defendant's motion. First, there is nothing in the record substantiating Dr. Slupik's conclusory observation that an examination of B.B.'s vaginal area is necessary because the colposcopic photographs present views of B.B.'s hymen that are inadequate to demonstrate conclusively whether or not there is a partial obliteration of B.B.'s hymen. The State made a vague concession at the hearing on the motion that the photographs do not show "everything" that Dr. Flannery saw in the examination. However, the adequacy of the photographs was not explored sufficiently in the court below. Therefore, we cannot say that Dr. Slupik's rationale for the examination is compelling.

Second, the sole evidence defendant has produced in support of his motion is the affidavit of Dr. Slupik, who alleges that the examination would be useful in challenging Dr. Flannery's finding of a partial obliteration of B.B.'s hymen. However, Dr. Slupik does not address the findings of Dr. Anderson. Although, due to B.B.'s discomfort, Dr. Anderson was unable to inspect her hymen, he did find "apparent scar tissue surrounding the vagina," specifically, "an adhesion of the labia

with a synechial scar of the tissue touching together, covering the opening of the [vagina] and obscuring the hymen." Dr. Anderson noted that the inspection of the hymen would provide "additional useful info[rmation] for a definitive [diagnosis]." He immediately added, however, that "the synechia is suggestive of previous trauma and raw edges coming together, suggestive of trauma." Dr. Slupik did not express an opinion on the accuracy of Dr. Anderson's finding of scar tissue. The relation of the scar tissue to the hymenal tear was not explored in the court below. Thus, it is not clear from the record whether a challenge to the existence of a hymenal obliteration supposedly found by Dr. Flannery necessarily would be a challenge to the existence of the scar tissue supposedly found by Dr. Anderson. Because Dr. Slupik's examination apparently would challenge only one of two apparently independent indications of trauma for which the State has produced evidence, we cannot regard defendant's request for the examination as "compelling." We hold that the record, in its current state, does not meet the standard set forth in *Visgar* and *Glover* and that the trial court erred in granting defendant's request for an examination.

Given the gravity of the criminal charge in this case and the seriousness of the interests implicated in defendant's request for an examination, the record was insufficiently developed on the issue at hand. We recognize that neither party requested an evidentiary hearing on defendant's request for the examination. Nonetheless, a trial court has an active, inescapable responsibility to ensure that the contested proceeding it oversees and the resulting rulings it issues accord with the appropriate legal standards, which in this instance require defendant to establish a compelling need. Some of the trial court's remarks suggest it did not evaluate defendant's request in accordance with the applicable standard. In its order granting the defense's motion *in limine* to sanction the State for its failure to comply with the order granting the examination, the trial court stated merely that there was a "clear need" for the examination. In its remarks at the hearing on the motion *in limine*, the court commented that the defense's request for the examination was "reasonable" and that the examination would yield evidence that is "relevant" and "enlightening." A "clear" need is not the same as a "compelling" need nor is a "reasonable" request the same as a "compelling" request.

We now turn to offer some guidance to the trial court on remand from this decision. To our knowledge, *Visgar* and *Glover* are the only published cases in which a reviewing court in Illinois has had occasion to apply the "compelling need" test to a defendant's request for an in-

dependent physical examination of the complaining witness in a sex offense case. A number of state courts have adopted a "compelling need" or "compelling reason" approach to such requests. See, *e.g.*, *People v. Chard*, 808 P.2d 351 (Colo. 1991); *State v. Garrett*, 384 N.W.2d 617 (Minn. Ct. App. 1986); *State v. D.R.H.*, 127 N.J. 249, 604 A.2d 89 (1992); *State v. Barone*, 852 S.W.2d 216 (Tenn. 1993); *State v. Delaney*, 187 W. Va. 212, 417 S.E.2d 903 (1992). However, while many of these courts have discussed at length what a trial court should consider in entertaining a defendant's request for an independent physical examination of the victim (see, *e.g.*, *Barone*, 852 S.W.2d at 221-22; *Chard*, 808 P.2d at 355-56), neither *Visgar* nor *Glover* states more than that a "compelling need" must be shown for the examination. We believe trial courts should be provided further guidance on this issue.

■ We agree with the *Barone* court that the "critical inquiry" involved in applying the "compelling need" test is "whether the evidence sought by the defendant is of such importance to his defense that it outweighs the potential for harm caused by the invasion of the complainant's privacy, including the prospect that undergoing a physical examination might be used for harassment of a prosecuting witness" (*Barone*, 852 S.W.2d at 222). We agree with the *Barone* court that the relevance of the requested examination to the defense must be considered in each case with due regard for the obvious fact "that the highly intrusive nature of a physical exam," especially (we note) a gynecological examination, "raises the same concerns about emotional trauma, embarrassment, and intimidation to the child victim that are present with psychological examinations" (*Barone*, 852 S.W.2d at 222; see also *State v. Ramos*, 553 A.2d 1059, 1062 (R.I. 1989) ("The practice of granting physical examinations of criminal witnesses must be approached with utmost judicial restraint and respect for an individual's dignity")). We approve of the approach, set forth in *Barone* and other cases, under which a trial court confronted with a defendant's request for an independent physical examination of the complaining witness in a sex offense case must consider (1) the complainant's age; (2) the remoteness in time of the alleged criminal incident to the proposed examination; (3) the nature of the requested examination and the intrusiveness inherent in it; (4) the resulting physical and emotional effects of the examination on the victim; (5) the probative value of the examination to the issue before the court; and (6) the evidence already available for the defendant's use (*Barone*, 852 S.W.2d at 222; *Delaney*, 187 W. Va. at 216, 417 S.E.2d at 907; *Ramos*, 553 A.2d at 1062). On remand, the trial court should weigh these factors in considering defendant's motion. Because the issues framed by the conflicting opinions of Drs. Flannery and Slupik over the necessity and propriety

of another examination of B.B. are intensely factual in nature and the record is incomplete in several critical respects, we believe an evidentiary hearing is necessary in this case for an adequate consideration of defendant's motion for an independent examination of B.B.

While the trial court must consider all of the above factors in addressing defendant's motion, we note that certain factors in particular must be given greater attention on remand than they were given previously. First, in addressing defendant's motion, the trial court gave inadequate consideration to the rights of B.B. We find inappropriate the trial court's remark that the body of B.B., "the young child," is "physical evidence." See *State v. Hewett*, 93 N.C. App. 1, 8, 376 S.E.2d 467, 471 (1989) (remarking of an attempt to compare the victim with cocaine powder, "Powder does not have dignity, and courts are rightly solicitous when a human being's privacy faces invasion"). Evidence does not have an interest in privacy. A person, on the other hand, does—even when she is not an alleged perpetrator but an alleged victim of crime. Section 4(a)(1) of the Rights of Crime Victims and Witnesses Act (725 ILCS 120/4(a)(1) (West 1998)) provides that crime victims have "[t]he right to be treated with fairness and respect for their dignity and privacy throughout the criminal justice process." The privacy interests of complainants have constitutional protection as well. "It is surely anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior." *Camara v. Municipal Court*, 387 U.S. 523, 530, 18 L. Ed. 2d 930, 936, 87 S. Ct. 1727, 1732 (1967); see *Darryl H. v. Coler*, 801 F.2d 893, 899-907 (7th Cir. 1986) (holding that visual examination of unclothed alleged minor victim by child protection worker implicated fourth amendment concerns); *People v. Browning*, 108 Cal. App. 3d 117, 124, 166 Cal. Rptr. 293, 297 (1980) ("It is our conclusion that witnesses should have, and we hold they do have, the same fourth amendment protection against governmental intrusion into their bodies that defendants in criminal cases have." Holding that proposed surgery on complainant to remove bullets remaining in his body for ballistic examination would be an unreasonable intrusion into his body proscribed under fourth amendment). When entertaining a motion by the defense for an independent physical examination of the complaining witness in a sex offense case, the trial court must give due consideration to the rights of the alleged victim as well as the rights of the defendant.

Second, the trial court must give greater consideration to the nature of the proposed examination and its potential physical and emotional impact on B.B. There is a degree of intrusiveness and humiliation associated with a gynecological examination, especially of a

young girl. See *Privee v. Burns*, 46 Conn. Supp. 301, 306, 749 A.2d 689, 693 (1999) ("[M]any people are likely to find unusually intrusive medical examinations, such as psychiatric and gynecological examinations, uncomfortable or even traumatic"); *Delaney*, 187 W. Va. at 216, 417 S.E.2d at 907 (noting the "intrusiveness and humiliation associated with a gynecological examination" of the victims, three young girls). In this respect, we find significant B.B.'s discomfort with and eventual "withdrawal" from Dr. Anderson's gynecological examination and Dr. Anderson's decision not to continue with the examination.

Third, it is important to consider the significant time that has lapsed since the offense, alleged to have occurred in October or November 1998. The examination by Dr. Slupik was first proposed in January 2000, more than one year after the alleged assault. More than two years have since passed. The lapse of time warrants serious consideration in light of the disagreement between Drs. Flannery and Slupik as to whether the evidence of trauma that Dr. Flannery found in December 1998 still existed even in January 2000 when Dr. Slupik's examination was proposed.

■ We also hold that the trial court erred in granting defendant's motion *in limine* to bar the State from introducing any evidence or testimony from B.B.'s examining physicians concerning their examinations of her. The exclusion of evidence is an "extreme sanction[ ] not favored when an alternative exists" (*People v. Weaver*, 92 Ill. 2d 545, 561 (1982)), and in our view the trial court imposed that sanction without giving proper consideration to the appropriateness of lesser sanctions. Due to length restrictions, our discussion of that issue is unpublished.

For the reasons provided above, the order of the circuit court of Du Page County granting defendant's motion for an independent physical examination of the alleged victim is vacated, and the cause is remanded for proceedings consistent with this decision.

Order vacated; cause remanded with directions.

GEIGER and GROMETER, JJ., concur.